**SO ORDERED.**

**SIGNED March 21, 2014.**



**ROBERT SUMMERHAYS
UNITED STATES BANKRUPTCY JUDGE**

_____

```
            UNITED STATES BANKRUPTCY COURT
             WESTERN DISTRICT OF LOUISIANA

IN RE:

GULF FLEET HOLDINGS, INC. ET AL           CASE NO. 10-50713

     Debtor
------------------------------------------------------------------
ALAN GOODMAN, TRUSTEE OF THE
GULF FLEET LIQUIDATING TRUST,

     Plaintiff

VERSUS                                    ADVERSARY NO. 12-05010

CANDY FLEET, LLC,

     Defendant

------------------------------------------------------------------
                    REASONS FOR DECISION
------------------------------------------------------------------
```

The present matter before the court is an adversary proceeding brought by Alan Goodman, Trustee of the Gulf Fleet Liquidating Trust (the "Trustee") against Candy Fleet, LLC. The Trustee asserts preference claims under 11 U.S.C. § 547(b) and seeks

avoidance of three payments made by Gulf Fleet to Candy Fleet totaling $166,625 during the ninety-day preference period. The parties have stipulated to the elements of a preference claim under section 547(b). The focus of the trial in this matter was Candy Fleet's "ordinary course of business" defense under 11 U.S.C. § 547(c)(2). The court took the case under advisement following a trial on the merits. After considering the record, the parties' briefs, and the relevant authorities, the court rules as follows.

**JURISDICTION**

This case has been referred to this court by the Standing Order of Reference entered in this district which is set forth as Rule 83.4.1 of the Local Rules of the United States District Court for the Western District of Louisiana. No party in interest has requested a withdrawal of the reference. The court finds that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Moreover, the court may enter final orders on the claims and defenses asserted in this case under Stern v. Marshall, ___U.S. ___, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). See First Choice Drywall, Inc. v. Presbitero (In re First Choice Drywall, Inc.), 2012 WL 4471570 (Bankr. N.D. Ill. Sept. 25, 2012)(bankruptcy court has the power to determine preference actions after Stern ); Olsen v. PG Design/Build, Inc. (In re Smeltzer Plumbing Sys., Inc.), 2011 WL 6176213 (Bankr. N.D. Ill. Dec. 12, 2011)(same); Nanodynamics, Inc.

-2-

v. Rothstein (In re Nanodynamics, Inc.), 474 B.R. 422, 429 (Bankr. W.D.N.Y. 2012) (same); Appalachian Fuels, LLC v. Energy Coal Resources, Inc. (In re Appalachian Fuels, LLC), 472 B.R. 731, 744 (E.D. Ky. 2012) (same); In re Am. Hous. Found., 469 B.R. 257, 265 (Bankr. N.D. Tex. 2012) (same); In re DBSI, Inc., 467 B.R. 767, 773 (Bankr. D. Del. 2012) (same); West v. Freedom Medical, Inc. (In re Apex Long Term Acute Care-Katy, LP.), 465 B.R. 452, 463 (Bankr. S.D. Tex. 2011) (same); Burtch v. Huston (In re USDigital, Inc.), 461 B.R. 276, 285 (Bankr. D. Del. 2011) (same).

## BACKGROUND

Gulf Fleet owned and operated a fleet of offshore and fast supply vessels that supported oil and gas exploration and production companies and other oilfield services companies. Gulf Fleet also operated an independent vessel brokerage business. Defendant Candy Fleet owns and operates sea vessels used primarily in the offshore oil and gas exploration industry. During the relevant time period, Candy Fleet leased its vessels through third-party brokers such as Gulf Fleet. From January 2008 through April 13, 2010, Gulf Fleet paid Candy Fleet approximately $6.1 million for vessels brokered by Gulf Fleet. The parties do not dispute that Candy Fleet generally invoiced Gulf Fleet soon after a vessel was brokered, but that Candy Fleet would not receive payment until Gulf Fleet invoiced and received payment from its end customer.

-3-

The parties refer to this payment arrangement as a "pay when paid" arrangement.

Gulf Fleet filed for relief under Chapter 11 of the Bankruptcy Code on May 14, 2010. The Trustee brought the present case against Candy Fleet under 11 U.S.C. § 547(b) and challenges three payments made to Candy Fleet from February 25, 2010 through April 13, 2010, totaling $166,625. The parties have stipulated that these transfers satisfy the elements of a preference claim under section 547(b). The question presented to the court is the applicability of the "ordinary course of business" defense to avoidance under 11 U.S.C. § 547(c)(2).

## DISCUSSION

Section 547(c)(2) provides that an otherwise avoidable transfer is not subject to avoidance:

> to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was--
>
> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>
> (B) made according to ordinary business terms....

11 U.S.C. § 547(c)(2). The ordinary course exception is an affirmative defense, so Candy Fleet has the burden of persuasion as

-4-

to each element of the defense. In re Gulf City Seafoods, 296 F.3d 363, 368 n.5 (5th Cir. 2002). Based on the trial record, there is no genuine dispute that the debts reflected by the challenged invoices were *incurred* in the ordinary course. Rather, the dispute centers on whether the transfers were made in the ordinary course of both parties (which is a subjective inquiry) or whether the transfers were made according to ordinary business terms as reflected in the relevant industry (which is an objective inquiry). In re SGM Acquisition Co. LLC, 439 F3d 233, 239 (5th Cir. 2006).

The subjective prong of the ordinary course defense requires a fact-specific examination of the parties' conduct to determine "whether the transactions between the debtor and the creditor before and during the ninety-day period are consistent." Lightfoot v. Amelia Maritime Services, Inc., (In re Seabridge Marine, Inc.), 412 B.R. 868, 872 (Bankr. E.D. La. 2008). The factors that courts consider include (1) the time period over which the parties engaged in similar transactions, (2) whether the amount or form of payment differ from past practices, (3) the presence of any unusual collection activity, and (4) whether the creditor took actions that gained it an advantage over other creditors in light of the debtor's deteriorating financial condition. See Kleven v. Household Bank F.S.B., 334 F. 3d 638, 642 (7th Cir. 2003); In re Quad Systems Corp., 2003 WL 25947345 at *5 (Bankr. E.D. Pa. 2003).

-5-

A creditor typically addresses these factors by establishing a "baseline of dealing" as far as the parties' past billing, payment, and collection practices. In re Accessair, Inc., 314 B.R. 386, 393 (8th Cir. BAP 2004) (creditor had "the burden of establishing some baseline of dealings between the parties prior to the preference period"). A creditor must establish that the challenged preference-period transfer falls within the normal pattern of payment practices between the parties during the pre-preference period. Id. Section 547(c)(2) provides that an otherwise avoidable transfer is not subject to avoidance:

> to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was--
>
> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>
> (B) made according to ordinary business terms ....

11 U.S.C. § 547(c)(2).

Candy Fleet contends that the three challenged transfers were made in the ordinary course of business in light of the parties' business dealings prior to the preference period. Specifically, like the payments prior to the preference period, the three challenged payments were made on a "pay when paid" basis after Gulf

-6-

Fleet received payment from the end customer. According to Candy Fleet's expert, the average time period between Gulf Fleet's receipt of payment from the end customer and the payment to Candy Fleet during the 90-day preference period was "not significantly different" than the parties' payment history from January 1, 2008 through April 30, 2009. (Joint Trial Exhibit ("Jt. Tr. Exh.") #3 at 3). Specifically, the average payment gap during the preference period was approximately 22.5 days from payment by the end customer to the payment to Candy Fleet, while the average payment gap for the period from January 1, 2008 through April 30, 2009 was approximately 14.61 days. (Id.). Candy Fleet also argues that the payment terms to Candy Fleet before and during the preference period were not more favorable than the payment terms to other vessel owners that brokered their vessels through Gulf Fleet. (Id. at 4).

The Trustee, on the other hand, argues that the three challenged payments are not consistent with the parties' payment history prior to the preference period. Specifically, the approximately 22-day average payment gap during the preference period is almost a 50% increase from the average payment gap from January 1, 2008 through April 30, 2009. The Trustee contends that this difference increases if the payment baseline is limited to payments occurring in 2008. During 2008, there was only a 13-day

-7-

average gap between payments by the end customer and payments to Candy Fleet. The Trustee also argues that Candy Fleet's position ignores the significant change in Gulf Fleet's payment practices occurring in 2009. Specifically, the payment gap increased from an average of 13 days in 2008 to approximately 22 days during the first four months of 2009. The average payment gap then increased to approximately 113 days from May 2009 through December 2009. (Id. at 3). The average gap then decreased during the preference period to 22.5 days. According to the Trustee, the three challenged payments could not have been made in the ordinary course of business in light of the shifting pattern of payments to Candy Fleet from 2008 through 2010.

Considering the record as a whole, the court agrees that Candy Fleet has not met its burden of proof under section 547(c)(2). The average payment gap for the three payments during the preference period (approximately 22.5 days) differs materially from the average payment gap during 2008 (approximately 13 days), which is a time period when Gulf Fleet's financial condition was relatively stable. While the average payment gap during the preference period matches the average payment gap for the period from January 1, 2009 through May 2009, the parties' payment history during first four months of 2009 does not serve as an appropriate baseline for at least two reasons. First, Gulf Fleet began to encounter worsening

-8-

liquidity problems in 2009. Gulf Fleet's former Chief Financial Officer, Michael Prejean, testified that, prior to 2009, Gulf Fleet's policy was to pay vessel owners within "a reasonable waiting period of about five days" of receiving payment from the end customer. (Jt. Tr. Exh. #5 at 19). Beginning in 2009, however, Gulf Fleet's financial condition deteriorated and it responded by delaying payments to vessel owners. (Id. at 19-20). The parties' payment history in 2009 reflects this change. The payment gap experienced by Candy Fleet increased from an average of 13 days during 2008 to an average 113 days during the second half of 2009. Accordingly, the parties' payment history during 2008 is a more sound baseline for purposes of the ordinary course defense than the first 4 months of 2009 given Gulf Fleet's deteriorating financial condition in 2009.

Second, comparing the average payment gap during the preference period to the average payment gap for the first four months of 2009 ignores the impact of a cash infusion that occurred in February 2010. Specifically, Prejean testified that Gulf Fleet's owner, H.I.G. Capital, contributed cash to Gulf Fleet to address its liquidity problems. (Id. at 87). This cash infusion allowed Gulf Fleet to pay old invoices more rapidly than the 113-day average during the second half of 2009. (Id.). Mr. Prejean's testimony is consistent with the observation of Candy Fleet's

-9-

expert that the average payment gap experienced by Candy Fleet decreased from 113 days in the second half of 2009 to approximately 22.5 days during the preference period. (Jt. Tr. Exh. #3 at 3).

In sum, the three challenged preference-period transactions are not only inconsistent with the parties' payment history during 2008 -- a period where Gulf Fleet's financial condition was relatively stable -- they also occurred after a cash infusion that allowed Gulf Fleet to cut the payment delay to Candy Fleet by 80% over the average payment gap during the second half of 2009. Considering the timing of the challenged payments and H.I.G.'s cash infusion, the parties' pre-preference period payment history does not support an ordinary course defense under the subjective prong of section 547(c)(2).

The record also does not support a defense under the objective prong of section 547(c)(2). There is support in the record for Candy Fleet's position that a "pay when paid" payment arrangement was customary in the relevant industry. However, the payment history between Gulf Fleet and Candy Fleet after 2008 was driven largely by circumstances unique to Gulf Fleet, and this shifting payment history largely tracks Gulf Fleet's deteriorating financial condition in 2009. In sum, the record does not support an ordinary course defense based on industry custom.

## CONCLUSION

For the foregoing reasons, the court finds in favor of the Trustee on his preference claim and finds that $166,625 of transfers are subject to avoidance under 11 U.S.C. § 547(b). The court finds against Candy Fleet on its ordinary course defense under 11 U.S.C. § 547(c)(2). The Trustee is entitled to judgment in the amount of $166,625.00 as well as pre-judgment and post-judgment interest In all other respects, relief is denied. The Trustee shall submit a judgment reflecting the court's ruling within twenty (20) days.

###